al. Good morning, your honors, and may it please the court. I'm John Lewis, together with my co-counsel, Michael Schwartzberg, represent the appellant Kyle D. Pikaluk in this case, who appeals from the granting of summary judgment by the district court of all of his claims against the Horseshoe Casino on account of an incident that occurred in March of 2018. We have a number of issues that we've raised concerning the propriety of summary judgment on account of the claims, and unless the court prefers otherwise, I will take those issues up in the following order. The first would be the Horseshoe's refusal and failure to this day to cash and redeem Mr. Pikaluk's casino chips in the amount of $33,700. Those chips include his winnings, it includes his initial buy-in of $2,800, and the casino's obligation—our argument is that the casino has an obligation under Louisiana gaming laws to redeem and cash those chips. They have not done so. It would be—it was error for the trial court to dismiss that claim without even addressing the Louisiana regulatory gaming laws. Second would be the claims under the Louisiana Unfair Trade Practices and Deceptive Trade Act, which provides a cause of action for unfair, deceptive, immoral, unscrupulous, whatever type of commercial activities that a jury will find based on the facts, offends fairness, offends what the—what Mr. Pikaluk should have received. And again, a casino represents— Back question. So he said he didn't know that Horseshoe was a Caesars casino, but he said he didn't want to use his total rewards card, and how would you use a total rewards card if you didn't know this was—I mean, total rewards is only for Caesars casinos. So that seems kind of inconsistent. Knowing you could use it but deciding not to is inconsistent with saying I didn't realize it was a Caesars casino. We're referring to comments made in the deposition or comments made in the video, Your Honor, or does it make any difference? I'm just asking a factual question. Factual question is, is that the Horseshoe is, in fact, a Caesars casino. I think what Mr. Pikaluk was telling or testifying to was that he had not realized he had been supposedly banned from the Horseshoe because it was not a Caesars casino that they had asked him not to come back to. So he knew it was a Caesars casino, he just didn't understand that the bar covered all Caesars casinos, including Horseshoe. Correct. At the time, he was talking about he had been in Las Vegas at Bally's, and they had asked him to leave, and he left. And he had not realized later that, well, the Horseshoe in Louisiana is part of the whole empire, and therefore, somehow or another, I might be banned here. But I think that's the reason, Your Honor. And there's no, is there any evidence in the record that he was given any kind of letter or anything that he's banned from all Caesars? Is there anything in the record? There is no record, there is no evidence in this record. This record consists of over a thousand pages. There is no record, no document showing that Mr. Pickalick, who lives in Canada, received any notice from Caesars in Las Vegas that you cannot come to any of our casinos and play, and if you do, we'll have you arrested for trespass or we'll kick you out. There is no record of that. The only evidence in this record of this banning is what we refer to as the wind-net message. It's a computer message. If you're a casino, if you're a Harrah's Casino or a Caesars Casino or the Horseshoe, you print in Mr. Pickalick's name and there's notes that come up. And those notes, which are internal, say that Mr. Pickalick was a global trespass, that's what they say. There are notes in their computers. There's nothing in there saying he was notified, nothing in there saying he was told, nothing saying that he actually received any notification. In fact, the evidence in the summary judgment record is that the address they had for him was a bad address. He had moved two or three years previously and he wouldn't have received anything probably if they had sent him something. Mr. Counsel, is this first claim that you have, it's a state conversion type claim, is it based solely on, I mean, I think it was $3,000 worth of chips, money that he gave to the window and got chips for, or is it also based upon slaying and getting, winning chips? Is it based upon ... We are clearly asking for the $33,700, which includes his buy-in, but includes his winnings. He played blackjack, and this is undisputed, I believe, for five hours. He won over $30,000. So it's both. It's both his initial amount that he's traded in dollars for chips and also all of his winnings. That's $33,000, is that what you said? In fact, the Louisiana Gaming Code, Section 4309A3 and C of 42 Louisiana Administrative Code, it's tab five of our appendix, makes no distinction between winnings or buy-ins. It says in two places, clearly, a casino that is licensed in the state of Louisiana will, when presented by a patron, redeem those chips. That's how you play at a casino. That's the representation the casinos give you when you walk in the door. Give me your money, your cash, I will give you chips, and at the end of the day, we'll settle up at the cage, which did not happen here. But are the chips still fungible? Could someone else take them in and cash them, or have they been marked in some way so that they're no longer valuable as currency in the casino? I'm just curious. This is not in the record, but this is how it works, is that as a practical matter, perhaps someone could walk in there and cash those chips. As a legal matter, probably not, because you're supposed to be a patron. And as a practical matter, the casinos, when you want to cash the chips, and you can look at this on the video, you can see it at the cage when he presented it. They will ask you, where did you get, if it's big chips, and all these chips are $500 chips. These are not $5 chips, $25 chips, or even $100, they're $500. You show up a bunch of $500 chips, they're going to say, where did you get these? Where were you playing? They might pick up the phone, did he actually win this? They want to know, they keep track of this. Right, but whether or not they're, under Louisiana law, they're supposed to be considered currency, for lack of a better word, in the casino. And so that's why I'm asking if they're still considered currency, or whether they're, I'll ask opposing counsel about it as well, because whether this is state law conversion, I'm trying to, this goes, it's not necessarily a hostile question for your conversion claim of whether there's still some value there that hasn't been adjudicated. Would you show up on his behalf and cash them in? I would submit that if I show up with those chips and ask that they be cashed, and they ask me where I got them, and I told them truthfully, they would refuse to cash them. I would submit that. And that would be based on you not, what about if you went and played a slot machine for a minute, so now you're a patron, signed up for total rewards, now you're a patron, and then you walked up there and said, I'm, uh. They would still want to know, and if I, if they cannot determine that I won those chips by, by playing at their casino. It's all speculation. I mean. It says patron. Does it say you have to have, I see that it says a thing about patrons, but it doesn't, where does it say, like, can my husband cash in my chips? There's nothing that says I have to have been the one, or he has to have been the one that won it. It said promptly redeem its own chips and tokens from its patrons. So if my husband's playing, and I'm playing, and I'm tired and go to bed and hand him off my chips, why can't he go cash them in? He can go cash them in, and they will undoubtedly cash them, uh, but it's, but if you're handing $30,000 worth of chips, they might, they're going to ask questions. Once they determine he's your husband, and you're cashing for you, they would probably cash those chips, but if they don't know the source of those chips, they might very well say we're not going to cash them. That's how, and again, it's not, it's not in the record, but that's how it works. Okay. Let's get back to the record and any arguments that you have on the law and the record. Okay. And then, uh, I wanted to move on to the claims for the violation of the civil rights and the, um, joint action with the police officers and the Louisiana state tort claims that arise from the unlawful warrantless arrest, uh, and, uh, imprisonment at the Bossier City jail. Uh, the district court dismissed all of those claims as I read the summary judgment decision based on one incorrect finding in the evidence, and that is that the Bossier City police, when they were summoned and arrived at the casino, that they somehow conducted an independent investigation, uh, into the events and determined on their own as a result of that independent investigation, that they had the probable cause or basis for arresting him and taking him to jail, prosecuting him for trespass, and it's undisputed that those trespass charges were dismissed subsequently after Mr. Picklock had to engage an attorney. Counsel, what case do we have that says they had to have interviewed him and determined whether or not he knew he should be on the property or not? Uh, you know, you could say that the investigation was not as thorough and that they made a mistake, but what gets it from not being thorough and mistake to, um, to that it's a violation of his rights? You know, because I, I'm going to ask the other side, they probably should have talked to him as part of the investigation, but they, they didn't, but, but nonetheless, what's the, what, what, how does that in any way transform it from not being an independent investigation? Uh, again, the standard both in the Louisiana cases as well as the federal cases from this court is that the investigation be independent, uh, and, and standard is, uh, for independence is that the arresting officers rely upon something more than the statements from the complaint, the complainant, uh, and again, we have the cases in our, our, our brief that you need an independent investigation, otherwise you don't break the causation chain, and the case is simply taking the statements, uh, of the complainant. Well, they also took the fact that he was there on the video, so it wasn't just based upon the statement. It was that he was there, and did they also have access to the little computer thing that said he was banned? Uh, the fact that he was there, I think, is irrelevant because when he was there and they saw him, he was in the custody of three casino people that they knew. The fact that, um, and I will also submit they did not have access to that computer thing. In fact, that's one of our main bases is that they didn't ask for any of the paperwork. They, they were promised some paperwork. They never received it. Okay. So what case says that that gets you over summary judgment? Uh, with respect to, uh, on, on civil rights or on the, well, either. On civil rights. Yes, sir. Okay. Okay. Uh, we're good. We're going back to Smith versus Brookshire. And. Smith is your case? Smith is the case out of the Fifth Circuit from 76, where this court said the plaintiffs have to show that the police and the store managers were acting in concert, that Brookshire and the police had a customary plan whose result was in the, was a detention in this case, and they cite the Atticus S.K. Kresge case, uh, and then they said the court after a trial concluded that such a plan had been evidenced. The arrest by the police department of the city of Lufkin were made without the filing of a complaint and without any investigation, all of which was pursuant to a said perceived plan. And they go on to say, here's the evidence in this case, and that is the police officer was asked on the witness stand, uh, what happened, and he said that he was summoned. Uh, he arrived at the scene. They pointed out Mr. Smith as being a shoplifter, and he arrested Mr. Smith, uh, as a shoplifter, and that was his investigation. And again, I don't have, uh, my hands on the, the cases that we cite in both our reply brief and our main brief where case after case requires an independent investigation and not an investigation based upon what the police say, and, and, and I see my time is out here, uh, uh, all, Your Honor. Any further questions? Thank you, Counsel. We have your argument, and you saved time for rebuttal. May it please the Court. Your Honor. Scott Zimmer on behalf of the Appellees. With the Court's permission, uh, Your Honors, I'll sort of pick up where, uh, where Counsel just leapt off. With regard to the cases that he relies on, it's the Smith v. Brooksher's case, also the Murray case out of the Eighth Circuit, and the DiRiso case. And the difference there, Your Honors, for instance, uh, Counsel read the police officer's, uh, testimony from the Brooksher's case, Smith v. Brooksher's, but there was a different part that he didn't read specifically where the police officer from the Lufkin Police Department testified that there was, in fact, a preconceived plan. There's actually testimony, and that's, that's the difference here on the 1983 claims. For the fact— How can you call this an investigation? All they did was show up, see the guy there, and were told he shouldn't be here, and that was it. That was their investigation. I, if that's good enough, then you're really never going to have a malicious prosecution case. Well, um, we believe it is good enough, Your Honor. Uh, this Court held in the Morris case. There, there are three indicia of an independent investigation that the courts look to, uh, one of which is an officer's interview of the complaining employee. Another one is the independent observation of the suspect. Uh, a third is the officer writing her own report. And all— All of this is, he's there, okay. Well, no, I mean, it'd be hard to arrest somebody for trespass if they're not there. But okay, they're there, fine. But the question when you're sitting in a public place like a casino, not my house and I'm saying you're trespassing, but you're in a public place where the average person is not trespassing, has to be that you're in violation of something. And they didn't show him anything other than just saying, uh, you're not supposed to be here. If that's an investigation, then I just think the, the malicious prosecution just runs out the window. I mean, this just does not seem like they didn't interview anybody, they didn't look at the computer screen, they didn't do anything. So how is that an investigation? Well, I think, Your Honor, again, just sliding back to the Murray case, I think the court said that is enough. And I think one of the issues here, and this is what the plaintiff is presenting this view that it is too simplistic to be an independent investigation. But we would suggest, Your Honor, this is not an involved crime as the record suggests. Sergeant Thomerson, who made the decision to arrest, as well as the officer who actually transported Jordan, they both testified in the record that this is our trespass investigation. This is not just for this casino. This is not just for the casinos in, in Bossier Parish. This is for property owners in the city of Bossier. It's consistent throughout. And I guess just, this is a public place. If I'm, you know, shopping at a grocery store, and I'm walking around with my cart, and all of a sudden a bunch of police officers show up and arrest me, I'm going to be a little bit shocked. Because I thought I was in a public place. And then some employee says, oh, yeah, she's not supposed to be here. And based on that, they can just arrest me? Yes, Your Honor. The simple answer is, for instance, Your Honor, because some... That's good enough? Well, because some public places may not be larger companies where you would expect policies in place where they have formal notifications that go, for instance, if it is a small mom and shop store, it is still a public place. But if the police officer goes in there, and the proprietor of that business is, visits, you know, if he's interviewed, or she's interviewed by the police officer, and it says that individual has been told on previous occasions that they're not allowed on my property, and the police officer views that individual on the property, and thereafter detains them, then yes, that is a proper investigation under those circumstances. And cuts off the malicious prosecution of the person making that comment. That's my question. Yes. Not whether you can do the arrest, but whether that cuts off, because the guy at Horseshoe had no idea if Mr. Pikulik had ever been told he wasn't supposed to come to Horseshoe. He had no idea. Then nothing said that on the computer. It's just completely lying. And yet that is enough, so I can lie, or Mr. X can lie to the police officer, and the police officer accepts that lie, and that's an independent investigation? No, Your Honor. What kind of an argument is that? You cannot lie. Okay, well, that's what this guy did. He said, yes, he's been told, but there was no indication of that anywhere, and he personally didn't know that, and the computer didn't say it. The record supports when that entry is made. Rob Brown, one of the defendants, testified the entry was made in June of 2016, and when it was made, it's done in connection with the ban or the eviction letters that are sent. So it's not a case of where they lied and said he was evicted and he knew about it. He didn't. They relied on their internal controls, their procedures, which is when this internal, when this company . . . Where in the record does it show that when you're barred from Bally's in Las Vegas, you would receive notice that you're barred from Horseshoe in Bossier City? I believe, Your Honor, it is around 508 to 511 is Mr. Brown's testimony, and I believe it's . . . Okay, but I want . . . Mr. Brown's the one who said it. I'm saying where is the Caesars policy or the . . . You're saying this was internal policy. Where is that policy that we can all look at that somebody could rely on if I'm an employee at Caesars and I rely on that policy? Your Honor, it's my recollection from the record that the evidence of that came from the testimony of the employees. My recollection was that it was Mr. Brown, it could be others, but no, there's . . . He's the guy that . . . I'm sorry? I mean, he's the guy that's accused of misrepresenting the situation, so it would seem to me if Caesars has this policy, it would be somewhere. It's a big company. Yes, Your Honor. Right? I don't . . . Huge. And so if they're going to . . . They're not just like two guys with a policy and they tell their friend. It's going to be written somewhere. Where is that? That's what I'm asking. If it's not in the records and on the record, that's fine. Clearly, Your Honor. Clearly, Your Honor, that is not in the record. There is not something from a handbook or an internal guide that has that. That is not in the record. Okay. If we thought the summary judgment evidence indicated that he lied, could indicate that he lied, and we're not sure, does that change your analysis? If . . . If he lied and that's a possibility, does that change your analysis in any way? I think, Your Honor, that may change my analysis with regard to the state law claims that I'll get to, but not with regard to the 1983 claims, because I don't think that would satisfy the element of fair attribution. I still don't . . . He would not be acting under color of law, even under that circumstance. So either way, and just to wrap up that section, either way, the plaintiff has not shown fair attribution. He's not shown these private individuals were acting under the color of law. Again, Your Honors, with the cases that were cited by the plaintiff on that issue, there was good evidence in those cases that there was a preconceived plan. In other words, an arrest was made and a detention was made just because the individual was pointed out by the merchant. It's undisputed under the law about trespassing, though, that he would have to give notice. You'd have to ask the person to have leaved. You either have to have done it . . . Yes. . . . before you're banned for all time, or you need to leave today. That's correct. That's part of law of trespass. Exactly. Okay. Exactly. In other words, one of the officers, Jordan, put it pretty succinctly in the record, Your Honor, is just that. He says, you're not supposed to be there, you know you're not supposed to be there, and you're there. And that's . . . when I see that, I'm going to detain somebody. I'm going to arrest somebody. Let me ask you about the chips. If Mr. Lewis showed up with the chips today in Bossier City, could he redeem those? Let's assume, argumentatively, he's a patron. Let's say he's played in the casino before or has a total rewards card or whatever it is. And he shows up with the $30,000 in chips. Can he redeem those? I don't know of a reason why he couldn't, Your Honor, and to get back to one of those questions . . . It would seem like y'all could have settled that part then. Well, to get back to . . . well, and the reason that the plaintiff couldn't redeem them, and it's captured on one of the videotapes, is because he had been evicted, and he's not entitled to it. He can't physically show up, but the chips are still valid. The chips are still . . . You haven't converted his money, have you? No. Well, why isn't there some evidence that you have? Because he hasn't been able . . . I mean, is the reason you haven't . . . not you personally, your client. Because they haven't been able to show that they tried to redeem the chips and they weren't able to? I'm just . . . the conversion claim is problematic. And so, what do you have to say about it? Well, there was a couple of questions in there, and I'm not sure I heard the first part about what . . . I think Your Honor asked whether it had been converted to currency. Well, no, I'm asking whether it's . . . does he have a claim that you have converted his money under Louisiana law because he wasn't able to cash his chips? Or is it not yet a claim because no one else has tried to cash the chips? I think that's probably it. Factually, Your Honor, before we get to the . . . legally, factually, as the court knows from the record, it's on tape when the plaintiff was still there at the scene, there was some discussion about cashing his chips, and he right away mentioned a lawyer, and Mr. Brown again gave the plaintiff the name of the Louisiana State Trooper who's over . . . the gaming there was a letter from a lawyer representing the plaintiff. So is it . . . Why have you all not paid it? I mean, I don't understand. So, we've got a lot going on in this case. Yes. But to me, these chips are pretty obvious. Certainly, the $2,800 that he paid money for is just, to me, irreconcilable to not redeem those. Now you're saying, well, we won't let him in to redeem them, which does seem a little bit like ha, ha, ha. But if you're saying, okay, Mr. Lewis can do it, why didn't y'all say that . . . I mean, why does that take me and the Fifth Circuit having to ask that instead of y'all resolving that and just paying it? They're asking for it. They've made a demand. Here's the chips. We want our money. Why are you not paying it? Well, and again, Your Honor, it was the defendant's position that the plaintiff wasn't entitled to those funds, the winnings, because he had previously been excluded. Okay, so you're saying they couldn't cash those. Not the winnings. Not the winnings. How would you know if Mr. Lewis showed up in your casino that these were winnings versus the $2,800? Well, that we would not. Because the chips, or as Your Honor mentioned, I think they're a kind of currency. They're not trackable in that manner. So why didn't the district court err? Why don't we have to at least send that claim back? You need to make an argument, a legal argument. Your Honor, I will make the argument that Judge Hicks made. And as to the conversion claim, he relied on 27 colon 27.4, and essentially it offers immunity against damage claims arising out of an exclusion. And according to the district judge . . . But this is not a damage. This is not like he broke his knee, I mean his arm or something, when he's trying to be arrested. This is not a damage claim out of an exclusion. You're correct, Your Honor. And I misspoke. I think the statute actually says liability arising from the exclusion. And that's what the district . . . Y'all could redeem the chips right now. Okay? This is a lawsuit. He has a lawyer. He's willing to proffer the chips. You could redeem them right now. Your other point is a little bit different, which is not liability for an exclusion. It's that he shouldn't get profits from having come when he was banned. But this gets back to the fact issue, which is a clear fact issue, whether he knew he was banned. And so if he didn't know he was banned, then yeah, you owe the other 30. But you even admit you owe the 2,800, and I'm just sitting here like, why are we at an appeal in the Fifth Circuit when you owe the 2,800 and you haven't paid it? Well, we would just rely on, again with the district judge, rely on, Your Honor, for . . . Yes, Your Honor.  . . to make a decision in Kennedy. And the plaintiff cannot meet his burden as to any of those tort claims. With regard to the negligence claims, Your Honor, a plaintiff primarily relies on the Fersley case. And we believe that ruling is much more narrow than the plaintiff would interpret it. And that gets back to if a merchant knowingly provides false information, perhaps there is a liability, but absent that, there's not. Other than that, Your Honors, if you don't have any other questions, we would request that the Court affirm. Thank you.  Do you have a rebuttal, sir? Sounds like you're going to be making a trip to Bossier City. Your Honor, unfortunately, to respond to your questions accurately, I'm going to have to go beyond the record. I'm happy to supplement it later. But when Mr. Pickelet came to Shreveport to give his deposition, he brought the chips with him. And prior to that, I'd asked Mr. Zimmer in a letter, can he cash those chips when he's in town? No response. During his client's depositions, I asked, can he go over and cash those chips now because of the ban, the fact that he was dismissed from his trespassing charges? They said they weren't sure, they'd have to check with legal on that. Is this something, you're telling us something out of the record? It's not in the record. Well, can you confine your remarks to today, to the extent you've already told us something out of the record? You have a right to file a 28-J in two days if there's some response, but let's all get back into the record. I agree. Perhaps we have led you out of the record, but let's all get back to the record for the Again, the reason it's not in the record, it really wasn't an issue at the summary judgment stage in the court below because the horseshoe did not ask for summary judgment on that conversion claim. Judge Hicks in the district court granted that sua sponte. Sponte. So we didn't have a chance to put anything in the record if that had been an issue. We didn't realize it was an issue. Okay. Okay. Moving on to, you asked me about some cases and I didn't have my fingers on them, but in our brief we do have a case called Plessy v. Hayes-Motor, Louisiana Appellate Court. That may have been, one of the two cases I know was a Judge Stewart case when he was on the Louisiana Court of Appeals, and the other case is called Labanque, and I give cited on pages 4 and 11 of our reply brief. And the Plessy case, Plessy v. Hayes-Motor, again, 742 Southern 2nd, 934, cited on pages 4, 8, 9, and 10. Both of those cases is where the complainant provided false information to the police that was told by the complainant. In each of those cases, the Louisiana Court said, that is not an independent investigation. It does not break the causation chain. You still have cause because what's caused or procured the arrest for malicious prosecution and for other torts is making the complaint in the first instance. Is there any evidence in the record whatsoever of a Caesar's policy that says when someone's reported on the computer, they are sent notice of same? There's nothing in the record, and I would submit there's nothing to put in the record because I would also submit that is not their policy. It is casino by casino by casino. But we don't know, and so it's- Yeah, you don't know. You don't know that, right. It's our judgment to find that to be an undisputed fact. That is correct. And again, going back to the 1983 cause of action and claims, we would submit that under these facts and what's on the video and the testimony, this is a jury question. This is not for Judge Hicks or the district court to make a judgment and weigh the evidence and conclude that there wasn't sufficient evidence of the customary plan, preconceived arrangement because we think that the evidence is there, the statements by the police officers, what you see on the video. In fact, at the very first dispatch call, again, it's in the record. We have the audio. The woman from the casino calls up the Bossier City Police and says, at the horseshoe, I have a person here who needs to be arrested for trespassing. It's a request to arrest. Again, this statute that he was arrested for doesn't have any jail time. It's a $500 fine. They came and arrested him. Did they read him Miranda rights? No, they read him no Miranda rights. I asked the deposition, why not? We didn't intend to ask him anything. If you're not going to ask him questions, we don't need to read Miranda warnings. I mean, there is nothing in this record that indicates that there was any investigation that was independent other than what the casino did, casino said, casino requested, and they did that each and every time. My time is up. Thank you very much, Your Honors, for listening to us today. Thank you. This case is submitted. We appreciate the helpful arguments today. We're going to take a brief recess before continuing with the hearing.